# UNITED STATES DISTRICT COURT
for the
Middle District of Florida
Orlando Division

| | | |
|---|---|---|
| LUCY WEISS, Individually, and BRIAN CHAPMAN, Individually, *Plaintiffs,* | ) | |
| -v- | ) | Case No. 6:26-cv-01416-GAP-LHP |
| BLUE WATER DEVELOPMENT CORP., d/b/a COMFORT INN & SUITES DAYTONA BEACH OCEANFRONT, and CHOICE HOTELS INTERNATIONAL, INC., *Defendants.* | ) | |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANT CHOICE HOTELS INTERNATIONAL, INC.'S MOTION TO DISMISS**

Plaintiffs, by and through undersigned counsel, respectfully submit this Response in Opposition to Defendant Choice Hotels International, Inc.'s ("Choice") Motion to Dismiss under Rule 12(b)(6). The Motion should be denied in its entirety.

## I. INTRODUCTION

Choice's Motion asks the Court to treat selected provisions of the Franchise Agreement as dispositive proof that Choice had no responsibility for the practices underlying this action. The Agreement does not support that conclusion. Although it assigns the franchisee responsibility for certain day-to-day operations, it also reserves to Choice authority over mandatory operating

standards, guest-transaction systems, training requirements, quality-assurance inspections, compliance evaluations, and corrective action. Those provisions must be considered together, not in isolation.

The Complaint alleges that Choice established and required compliance with brand-wide operational standards governing hotel operations, ADA compliance, service-animal accommodations, and guest charges, and that Choice jointly controlled or influenced the policies and practices at the subject hotel. The Agreement provides contractual support for those allegations: it requires compliance with Choice's mandatory Rules and Regulations, authorizes Choice to evaluate compliance and require corrective action, mandates use of Choice's property-management system for hotel operations and guest transactions, and imposes ADA-certification and training requirements. The Agreement's independent-contractor and responsibility-allocation provisions do not negate the authority Choice expressly retained.

Plaintiffs do not contend that the Agreement, standing alone, establishes that Choice imposed or received the challenged $100 surcharge. It does, however, demonstrate that Choice's role extended beyond passive brand licensing and provides a basis to examine its authority and involvement in the operational practices at issue. Because the Complaint alleges Choice's involvement in those practices, and the Agreement does not conclusively foreclose it, dismissal at the pleading stage is unwarranted.

## II. LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must contain sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The Court must accept well-pleaded factual allegations as true and draw all reasonable inferences in Plaintiffs' favor. *Speaker v. U.S. Department of Health & Human Services Centers for Disease Control & Prevention*, 623 F.3d 1371, 1379 (11th Cir. 2010).

A court may consider a document attached to a motion to dismiss if the document is central to the plaintiff's claims and its authenticity is undisputed. *Horsley v. Feldt*, 304 F.3d 1125, 1134–35 (11th Cir. 2002); *Brooks v. Blue Cross & Blue Shield of Florida, Inc.*, 116 F.3d 1364, 1368–69 (11th Cir. 1997). But considering the Franchise Agreement does not require the Court to accept Choice's interpretation of it or treat its allocation of day-to-day responsibilities as dispositive. The Agreement must be considered as a whole, including the authority Choice retained over operating standards, guest-transaction systems, and compliance oversight. Those provisions, together with the Complaint's allegations, do not permit the Court to resolve the extent of Choice's operational involvement in Choice's favor at the pleading stage.

## III. ARGUMENT

**A. Plaintiffs plausibly allege that Choice operated the hotel with respect to the practices underlying the alleged ADA violation.**

Title III prohibits discrimination by any person who "owns, leases (or leases to), or operates" a place of public accommodation. 42 U.S.C. § 12182(a). A hotel is expressly identified as a place of public accommodation. 42 U.S.C. § 12181(7)(A). The issue is whether Choice's role extended beyond brand licensing to include authority over the operational practices underlying Plaintiffs' allegations.

The Complaint alleges that Choice established operational standards and policies for its franchise properties, including requirements concerning ADA compliance and service-animal accommodations, and jointly controlled or influenced the hotel's policies and practices concerning service animals, guest charges, and ADA compliance. (Compl. ¶¶ 11–12.) The Franchise Agreement supports those allegations. It requires compliance with Choice's Rules and Regulations, which Choice may modify in its discretion; mandates use of Choice's property-management system for hotel operations and all guest transactions; and authorizes Choice to evaluate compliance with its standards and quality-assurance program and require correction of identified deficiencies. (Franchise Agreement §§ 6(a), 6(g)–(h).)

The Agreement also assigns the franchisee responsibility for day-to-day

operations, compliance with applicable law, and training its own employees. (Id. §§ 6(d)–(e).) Those provisions are relevant, but they do not eliminate the authority Choice retained over mandatory operating rules, guest-transaction systems, and compliance oversight. The question is whether that authority extended to the particular practices implicated by Plaintiffs' claims, not simply which party managed routine hotel operations.

That distinction is important because Plaintiffs allege a discriminatory guest charge, not an architectural barrier or structural condition. The governing regulation expressly prohibits a public accommodation from requiring an individual with a disability to pay a surcharge because of the use of a service animal, even when individuals accompanied by pets are charged fees. 28 C.F.R. § 36.302(c)(8). The challenged conduct therefore concerns a guest-facing policy and transaction involving service-animal accommodations.

In *Neff v. American Dairy Queen Corp.*, 58 F.3d 1063, 1066–68 (5th Cir. 1995), the Fifth Circuit considered whether a franchisor controlled the particular aspect of the franchise location underlying an architectural-accessibility claim. It concluded that authority over unrelated matters did not establish that the franchisor operated the restaurants for purposes of the ADA. Although *Neff* is nonbinding and involved a different type of violation, its focus on the relationship between the franchisor's authority and the specific conduct alleged is instructive. Here, Choice's authority over mandatory operating rules,

guest-transaction systems, and compliance evaluations is relevant to whether it retained authority over the service-animal and guest-charge practices at issue.

The Agreement does not establish that Choice imposed or approved the surcharge, but it also does not conclusively establish that the hotel's service-animal and guest-charge practices were beyond Choice's operating standards, transaction systems, or compliance oversight. Whether Choice exercised its retained authority with respect to those practices cannot be resolved in its favor by relying solely on the franchisee's responsibility for daily operations. Plaintiffs have plausibly alleged a direct-operator theory, and dismissal on that basis is unwarranted.

**B. The Franchise Agreement does not foreclose an actual-agency relationship between Choice and the hotel operator.**

Choice relies on the Franchise Agreement's allocation of day-to-day responsibilities to the franchisee and its designation of the parties as independent contractors. Those provisions do not end the inquiry. Under Florida law, an agency relationship may exist where a franchisor, through its contract, actions, or representations, "has directly or apparently participated in some substantial way in directing or managing acts of the franchisee, beyond the mere fact of providing contractual franchise support activities." *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119, 120 (Fla. 1995). The inquiry turns

on the parties' actual relationship and the franchisor's participation in directing or managing the franchisee's conduct, not merely the contractual label.

The Agreement reserves to Choice authority over mandatory operating standards, management training requirements, guest-transaction systems, and compliance oversight. The franchisee must comply with Choice's Rules and Regulations, which Choice may modify in its discretion; the franchisee and general manager must attend Choice-designated training; and the hotel must use Choice's property-management system for hotel operations and all guest transactions. (Franchise Agreement §§ 6(a), 6(e), 6(g).) Choice may also evaluate compliance with the Agreement, its Rules and Regulations, and its quality-assurance program, and require correction of identified deficiencies. (Id. § 6(h).) Although the franchisee remains responsible for compliance with applicable law and training its own employees, those allocations do not eliminate the separate question whether Choice substantially participated in directing or managing the hotel's relevant operational practices. (Id. §§ 6(d)–(e).)

In *Doe K.R. v. Choice Hotels International, Inc.*, No. 6:23-cv-1012-JSS-LHP, Doc. 68 at 28–29 (M.D. Fla. June 12, 2024), the court applied *Mobil Oil* and declined to dismiss an actual-agency claim against Choice based on allegations of its substantial involvement in hotel operations, including staff

training, operational policies, reservation and payment systems, customer complaints, inspections, and compliance oversight. Although *Doe K.R.* involved more extensive allegations of operational involvement, it confirms that the actual-agency inquiry requires consideration of the franchisor's alleged participation in the franchisee's operations, rather than treating independent-contractor language as dispositive.

Here, Plaintiffs allege that Choice established operational standards for ADA compliance and service-animal accommodations and jointly controlled or influenced the hotel's policies and practices on those matters and related guest charges. (Compl. ¶¶ 11–12.) The Agreement's provisions governing mandatory operating rules, management training, guest-transaction systems, and compliance evaluations provide context for those allegations. Whether Choice substantially participated in directing or managing the hotel's relevant practices cannot be resolved solely by the Agreement's independent-contractor provisions. As such, the Complaint and Agreement do not foreclose Plaintiffs' actual-agency theory at the pleading stage.

**C. Plaintiffs plausibly allege interference with the exercise of ADA-protected rights.**

Section 12203(b) of the ADA prohibits coercing, intimidating, threatening, or interfering with an individual in the exercise or enjoyment of rights protected by the ADA, including an individual who aids or encourages

another person in exercising those rights. 42 U.S.C. § 12203(b). Section 12203(c) makes Title III's remedies and procedures applicable to such violations. 42 U.S.C. § 12203(c). The implementing regulation identifies as prohibited conduct coercing an individual to deny or limit benefits to which the individual is entitled and threatening, intimidating, or interfering with an individual seeking to use the goods, services, or accommodations of a public accommodation. 28 C.F.R. § 36.206(b)–(c).

The Eleventh Circuit has not adopted a definitive standard for evaluating an ADA interference claim. *Atchison v. Board of Regents of the University System of Georgia*, 802 F. App'x 495, 508–09 (11th Cir. 2020). It discussed competing approaches but declined to select one because the allegations before it failed under any potentially applicable standard. *Id.* at 508–09. Plaintiffs therefore rely on the statutory text and the regulation's express illustrations of prohibited coercion and interference.

The Complaint alleges that hotel personnel initially demanded a $250 fee because Ms. Weiss was accompanied by her service animal and, after being informed that the animal was a service animal, nevertheless charged $100 to Mr. Chapman's credit card. (Compl. ¶¶ 16–24, 36–39.) The regulation expressly prohibits a public accommodation from asking or requiring an individual with a disability to pay a surcharge because of the use of a service animal, even when individuals accompanied by pets are charged fees. 28 C.F.R.

§ 36.302(c)(8). The alleged demand, persistence after being informed of the animal's status, and eventual collection of the charge support an inference that hotel personnel sought to pressure Plaintiffs to pay a fee they were not legally required to pay, thereby interfering with Ms. Weiss's exercise of her right to use her service animal. This is more than an allegation that an ordinary hotel charge was imposed.

Section 12203(b) also protects individuals who aid or encourage another person in exercising ADA rights. 42 U.S.C. § 12203(b). The Complaint alleges that Chapman accompanied Weiss, participated in disputing the charge, and was charged directly on his credit card. (Compl. ¶¶ 9, 16–24, 36–39.) Those allegations identify his participation in Weiss's exercise of her protected right and the direct financial consequence he suffered. His individual interference theory rests on the allegation that the challenged conduct was directed at him in connection with his assistance to Weiss.

Choice's potential responsibility for the alleged interference rests on the Complaint's allegations that it established standards concerning ADA compliance and service-animal accommodations and jointly controlled or influenced the hotel's practices concerning those matters and guest charges. (Compl. ¶¶ 11–12.) The Franchise Agreement's provisions governing mandatory operating rules, guest-transaction systems, and compliance evaluations provide further context for those allegations. (Franchise

Agreement §§ 6(a), 6(g)–(h).) As explained above, Plaintiffs allege a plausible basis for holding Choice responsible as an operator or through an actual agency relationship.

The Complaint therefore plausibly alleges that hotel personnel demanded and collected a prohibited service-animal surcharge in a manner that interfered with Weiss's exercise of ADA-protected rights. Chapman's alleged assistance to Weiss and the charge imposed on his credit card further support his claim that he was affected by the alleged interference. Therefore, dismissal of Count II is unwarranted.

**D. Plaintiffs plausibly allege an unfair or deceptive practice, causation, and actual damages under FDUTPA.**

A private claim for damages under FDUTPA requires allegations of (1) a deceptive act or unfair practice, (2) causation, and (3) actual damages. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). A deceptive practice is one likely to mislead a consumer acting reasonably under the circumstances. An unfair practice is one that offends established public policy and is immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers. *PNR, Inc. v. Beacon Property Management, Inc.*, 842 So. 2d 773, 777 (Fla. 2003).

The Complaint alleges an unfair practice arising from the attempted imposition and collection of a service-animal surcharge. Plaintiffs allege that

hotel personnel demanded a $250 fee because Ms. Weiss was accompanied by her service animal and ultimately charged $100 to Mr. Chapman's credit card despite being informed that the animal was a service animal. (Compl. ¶¶ 19–22, 42–45.) The alleged charge was not an ordinary room charge or a disclosed charge for an additional hotel service. The hotel imposed it because of Ms. Weiss's use of a service animal, despite the regulation expressly prohibiting a public accommodation from requiring an individual with a disability to pay a surcharge because of the presence of a service animal. 28 C.F.R. § 36.302(c)(8). Imposing and collecting a fee that federal law expressly prohibits, based on a guest's use of a service animal, plausibly constitutes an unfair practice under FDUTPA.

The alleged conduct also supports a deceptive-practice theory. A consumer acting reasonably would not expect a hotel to impose a pet-related surcharge on a qualifying service animal when federal law expressly prohibits that charge. The Complaint alleges that the fee was demanded and collected despite Plaintiffs' explanation that the animal was a service animal. (Compl. ¶¶ 19–22, 42–45.) The alleged conduct therefore concerns more than a disagreement over an ordinary hotel charge; it involves imposing a charge the hotel was legally prohibited from collecting.

The Complaint further alleges a direct economic loss: the hotel charged $100 to Chapman's credit card. (Compl. ¶¶ 9, 22, 46.) Chapman thus alleges

that he personally paid the challenged surcharge, rather than merely experiencing embarrassment, inconvenience, or other consequential injury. Choice may dispute whether that payment satisfies FDUTPA's governing measure of actual damages. Florida courts measure FDUTPA actual damages by the difference between the market value of the product or service as delivered and its market value as it should have been delivered. Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. 2d DCA 2006). Consequential damages are not recoverable. Id. Plaintiffs' theory, however, is that the $100 was itself an unauthorized surcharge extracted as part of the lodging transaction, not a consequential expense arising from a separate injury. The amount and recoverability of that direct charge can be addressed on a developed record; the Complaint identifies a specific monetary charge and the transaction from which it allegedly resulted.

Choice argues that the challenged conduct cannot be attributed to it because Choice did not personally demand the fee or process the credit-card transaction. Plaintiffs do not contend that Choice's mere status as franchisor establishes FDUTPA liability. Rather, the Complaint alleges that Choice established operational standards and policies concerning ADA compliance and service-animal accommodations and jointly controlled or influenced the hotel's policies and practices concerning those subjects and guest charges. (Compl. ¶¶ 11–12, 25–26.) The Franchise Agreement provides relevant context

for those allegations: it requires compliance with Choice's Rules and Regulations, mandates use of Choice's property-management system for guest transactions, and authorizes Choice to evaluate compliance and require corrective action. (Franchise Agreement §§ 6(a), 6(g)–(h).)

Those provisions do not establish that Choice selected the $100 amount, received the surcharge, or directed the particular transaction. They do, however, provide contractual context for the Complaint's allegations concerning Choice's involvement in the hotel's operating standards and guest-charge practices. As discussed above, Plaintiffs allege that Choice operated the hotel with respect to the practices underlying the alleged discrimination and that its relationship with the hotel operator supports actual agency. Whether Choice's own conduct or conduct attributable to it through an applicable agency relationship caused the challenged charge should be considered in light of those allegations and the Agreement as a whole, rather than resolved solely by reference to the independent-contractor provisions.

Accordingly, the Complaint alleges that the hotel imposed and collected a service-animal surcharge prohibited by federal law, identifies the $100 payment as a direct monetary loss to Chapman, and alleges facts connecting Choice to the operational policies and practices underlying the charge. Whether the $100 payment satisfies FDUTPA's actual-damages requirement and whether Choice's conduct or its relationship with the hotel operator

establishes causation are issues that should not be resolved against Plaintiffs based solely on the Franchise Agreement at the pleading stage.

**E. The Contract and Unjust-Enrichment Claims Must Be Evaluated Separately.**

**1. Plaintiffs' contract claim rests on the alleged lodging agreement, not the Franchise Agreement.**

Choice argues that Plaintiffs cannot maintain a breach-of-contract claim because they did not enter into the Franchise Agreement. That argument addresses a different contract. Plaintiffs allege that they entered into a lodging agreement for their stay at the subject hotel, paid the agreed room rate and disclosed charges, and were not informed that an additional service-animal fee would be imposed. They further allege that Defendants breached the lodging agreement by demanding a $250 fee and ultimately charging $100 because Ms. Weiss used her service animal. (Compl. ¶¶ 49–53.)

The absence of Plaintiffs' signatures on the Franchise Agreement does not resolve the terms or parties to the separate lodging transaction. The Complaint alleges that Choice participated in the reservation and operational systems governing the hotel and influenced policies concerning guest charges and lodging practices. (Compl. ¶¶ 11–12.) The Franchise Agreement requires the hotel to use Choice's reservation and property-management systems for reservations, hotel operations, and guest transactions. (Franchise Agreement

§ 6(g).) These provisions provide context for Choice's alleged involvement, but they do not, standing alone, establish that Choice undertook contractual obligations to Plaintiffs.

The Franchise Agreement does not itself defeat the lodging-contract claim. Whether Choice may be held liable for breach of that agreement depends on the actual booking arrangements and the contractual undertaking, if any, attributable to Choice.

**2. Plaintiffs' unjust-enrichment claim requires consideration of the benefit allegedly received by each Defendant.**

Unjust enrichment requires a benefit conferred on the defendant, the defendant's knowledge and voluntary acceptance and retention of that benefit, and circumstances making retention inequitable. *F.H. Paschen, S.N. Nielsen & Associates LLC v. B&B Site Development, Inc.*, 311 So. 3d 39, 48 (Fla. 4th DCA 2021). The plaintiff must also confer a sufficiently direct benefit on the defendant. *Kopel v. Kopel*, 229 So. 3d 812, 818 (Fla. 2017).

The Complaint identifies the specific $100 surcharge, alleges that it was imposed because Ms. Weiss used her service animal, and alleges that the charge was placed directly on Mr. Chapman's credit card. (Compl. ¶¶ 9, 22, 55–59.) Those allegations identify a concrete payment and support the claim against the entity that received and retained the charge.

The analysis as to Choice is different. Florida law does not categorically

bar unjust-enrichment claims merely because a benefit passes through an intermediary. *Cape, LLC v. Och-Ziff Real Estate Acquisitions LP*, 370 So. 3d 1010, 1017 (Fla. 5th DCA 2023). But the benefit must be sufficiently direct, rather than merely indirect or tangential. *Id.*; *Marrache v. Bacardi U.S.A., Inc.*, 17 F.4th 1084, 1102 (11th Cir. 2021). In *Cape*, the plaintiffs' payment to an intermediary specifically subsidized the defendants' acquisition. In *Marrache*, the alleged benefit to a manufacturer from consumers' purchases through a retailer was too indirect.

Here, the Complaint alleges that Defendants received and retained the surcharge, but it does not identify how Choice itself received or retained any portion of Chapman's $100 payment. The Franchise Agreement requires use of Choice's property-management system for guest transactions and gives Choice authority over certain operating standards and compliance evaluations. (Franchise Agreement §§ 6(a), 6(g)–(h).) Those provisions provide context for Choice's relationship with the hotel, but they do not establish that Choice processed, received, or otherwise benefited directly from this particular surcharge.

**3. Any deficiency concerning Choice's contractual undertaking or receipt of a benefit should be addressed through amendment.**

The Complaint identifies the lodging transaction, the challenged surcharge, and Choice's contractual relationship with the hotel operator. If the

Court concludes that Plaintiffs have not adequately alleged that Choice undertook contractual obligations under the lodging agreement or directly received a benefit attributable to the surcharge, Plaintiffs request leave to amend under Federal Rule of Civil Procedure 15(a)(2). Any amendment would be based on the applicable reservation terms, booking and payment records, and transaction arrangements, to the extent those materials support additional allegations.

The Court should therefore evaluate the lodging-contract and unjust-enrichment claims separately from Plaintiffs' allegations concerning Choice's operational involvement. The Franchise Agreement does not resolve the terms of the separate lodging transaction or conclusively establish whether Choice received a benefit.

**F. The Franchise Agreement Does Not Categorically Foreclose Plaintiffs' Apparent-Agency Theory.**

Choice argues that the independent-contractor provisions of the Franchise Agreement defeat any agency theory, but agency turns on the purported principal's representations to the third party and the third party's reliance, not merely the contractual characterization of the franchisor-franchisee relationship. Under Florida law, apparent agency requires a representation by the purported principal, reliance on that representation, and a resulting change in position. *Mobil Oil Corp. v. Bransford*, 648 So. 2d 119,

121 (Fla. 1995).

The Complaint alleges that Choice established and maintained the Comfort Inn brand and imposed operational standards governing its franchise properties. (Compl. ¶¶ 11–12.) The Franchise Agreement requires the hotel to comply with Choice's Rules and Regulations, use Choice's reservation and property-management systems, and participate in specified guest-service programs. (Franchise Agreement §§ 6(a), 6(g), 6(j), 6(q).) Although these provisions describe Choice's relationship with the hotel operator, they do not, standing alone, establish that Choice made representations to Plaintiffs or that Plaintiffs relied on them. *Mobil Oil*, 648 So. 2d at 121.

If the Court finds the Complaint insufficiently alleges Choice's representations, Plaintiffs' reliance, or a resulting change in position, they request leave to amend under Federal Rule of Civil Procedure 15(a)(2) to identify the Choice-controlled website, reservation materials, advertising, or other representations actually encountered by Plaintiffs and explain how those representations influenced their decision to book the hotel. The independent-contractor provisions do not categorically foreclose apparent agency, but Plaintiffs recognize that the claim requires facts establishing the elements Florida law demands.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court

deny Choice Hotels International, Inc.'s Motion to Dismiss. Alternatively, if the Court finds any claim or theory of liability against Choice insufficiently pleaded, Plaintiffs request leave to amend pursuant to Federal Rule of Civil Procedure 15(a)(2). Plaintiffs further request such other and further relief as the Court deems just and proper.

Respectfully Submitted,

**LLG NATIONAL LAW GROUP**

Dated: November 3, 2026



Robert S. Mactavish, Esquire
Florida Bar Number 0596388
Phoenix Corporate Tower
3003 N. Central Avenue
Suite 685
Phoenix, AZ 85012
P: 575-517-6542
robert.mactavish@llgnational.com
*Attorney for Plaintiffs*

## CERTIFICATE OF SERVICE

Pursuant to Federal Rule of Civil Procedure 5(b)(3), this document is being filed electronically and service shall be through the Court's transmission facilities on all persons appearing before this Court.



Robert S. Mactavish